Emerson Foulke and Margaret Foulke, et al. [1] v. Commissioner. Foulke v. Commissioner
Docket Nos. 24249-24251.
United States Tax Court
T.C. Memo 1955-175; 1955 Tax Ct. Memo LEXIS 147; 14 T.C.M. (CCH) 666; T.C.M. (RIA) 55175; June 30, 1955
*147 James J. Waters, Esq., 712 Commerce Building, Kansas City 6, Mo., James C. Logan, Esq., and Darrell L. Havener, Esq., for the petitioners. Mark Townsend, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: The original report in these proceedings, Memorandum Findings of Fact and Opinion, was filed on March 31, 1954 [13 TCM 329]. [2] The petitioners filed motions for further hearing. The motions were granted. Upon further hearing it becomes necessary to modify the conclusions reached under the only question to be decided which relates to Emerson Foulke and Kelsey Norman, petitioners. For convenience, the original Memorandum Findings of Fact and Opinion has been vacated and set aside insofar as it relates to the petitioners, Emerson Foulke and Kelsey Norman. The Commissioner originally determined deficiencies in income *148 tax to which he added, under section 293(b) of the Internal Revenue Code, 50 per cent additions for fraud as follows: Defi-
Addition
Docket Numbers
Year
ciency
293(b)
24251
1941
$4,073.39
$2,161.72
Kelsey Norman
1942
5,023.40
2,511.70
1943
2,527.71
1,263.86
24250
1944
9,556.22
4,778.11
K. & R. Norman
1945
6,718.91
3,359.46
1946
4,220.38
2,110.19
24249
1944
685.50
342.75
E. & M. Foulke
1945
1,072.21
536.11
1946
1,231.43
615.72
The Commissioner filed amendments to his answers at the further hearing in these proceedings in which he affirmatively alleged, as alternative to the previously determined fraud penalties, that in the event the Court should hold upon further consideration that no part of any deficiency is due to fraud with intent to evade tax, then each of the petitioners is liable for 5 per cent additions to the deficiencies for negligence as provided by section 293(a) of the 1939 Code. The Commissioner made claim for the additions of the negligence penalties by the amendments to his answers. At all times, the parties have agreed under stipulations upon the amounts of the taxable *149 net income of each petitioner for each of the taxable years. The only question for decision in each proceeding is and at all times has been whether any part of a deficiency was due to fraud with intent to evade tax. The petitioners, by amended replies to the Commissioner's amendments to his answers, admit that part of each deficiency was due to negligence, or intentional disregard of rules and regulations but without intent to defraud, and that, therefore, there is liability for the 5 per cent negligence penalties under section 293(a). In Docket No. 24251, Kelsey Norman, petitioner, the deficiency for 1941 is barred unless a false or fraudulent return was filed. The parties entered into new stipulations which were filed at the further hearing. The amounts of the deficiencies for the years and for the petitioners to which the stipulations relate will be less than were originally determined upon the making of recomputations under Rule 50. The returns of all the petitioners for the taxable years were filed with the collector for the sixth district of Missouri. Findings of Fact The stipulations of the parties in all of these proceedings, together with the attached schedules, *150 are incorporated herein by this reference. The facts agreed upon in the stipulations are found in accordance with the stipulations. All the petitioners are residents of Joplin, Missouri. In Docket Nos. 24249 and 24250, the issue relates only to the income and business transactions of Emerson Foulke and Kelsey Norman, and, therefore, for convenience, they are referred to hereinafter as the petitioners, or as Foulke and as Norman. Norman and his wife, Ruth, filed joint returns for the years 1944 to 1946, inclusive; and Foulke and his wife, Margaret, filed joint returns for the years 1944 to 1946, inclusive. Norman and Foulke are lawyers who have engaged in, and are still engaged in, the practice of law in Joplin, Missouri. Prior to May 1, 1944, Norman carried on a law practice as an individual, as did Foulke. On May 1, 1944, Norman and Foulke formed a law partnership, as equal partners, which is referred to hereinafter as the N.F. partnership. On January 1, 1946, another partnership was formed consisting of Norman, Foulke, and Warten, which is referred to hereinafter as the N.F.W. partnership, in which Norman and Foulke had a 40 per cent interest, each and Warten had a 20 per *151 cent interest. Warten had been in the military service, in the United States Marine Corps, from October 28, 1942 until December 14, 1945. He is a nephew of Norman. Issue 1. Facts Relating to Individual Income of Kelsey Norman The law practice of Norman, as an individual, consisted largely of personal injury and compensation claims cases. Substantially all payments were made by check by clients, but there were a few instances where cash payments were received. Norman maintained one commercial bank account in which the receipts from his professional business were deposited. Undeposited cash receipts constituted a minor part of his income and were used to pay business and personal expenses. The accounting records of Norman's business receipts and expenditures were maintained in his office by his secretary. Norman did not make entries in these accounting records. The accounting records consisted of loose-leaf ledgers and journals. Apparently, the secretary was inexperienced and was not capable of properly maintaining the books. The names of clients were entered upon ledger sheets, as were office and other expenditures. Receipts from clients, clients' costs, and the expenses of the *152 clients' business were entered on such sheets under their names - duplicate bank deposit slips were filed in the office, upon which notations were made of the amounts received from clients. Bank statements and canceled checks were maintained in the office. Norman did not have any income from his individual law practice in 1946. During the years 1941 through 1946, Norman received a small amount of income in each year from dividends. Also, he owned several pieces of improved real estate which he rented, and he occasionally sold a piece of real estate, or bought a piece of property. He received rents in each year from the rental properties, and expenses of maintaining the properties were incurred and paid. In some of the years, 1941 to 1946, Norman's properties were operated at a profit, and in other years, at a loss. Also, in some instances a sale of a piece of property resulted in a loss, and in other instances in a profit. At the time Norman's income tax return was prepared for the calendar year 1941, he was not present, due to illness and resulting confinement. During the period involved, there were frequent and repeated absences from the office on the part of Norman, due to a *153 heart and nervous condition, for which he was hospitalized. He was advised to remain out of court and to avoid contested cases. Due to his condition and to the condition of close members of his family, he had a constant fear of impending disaster. He was advised by his doctor that it was imperative that he should get away from the stress which he was undergoing. A rent receipts book was maintained in Norman's office. Norman knew what the monthly rentals were and notations were made in the rent receipts books by his stenographer of rent payments received. Sometimes tenants paid Norman their rent by cash or by check at his home. The net income reported in the returns for 1941-1945, and the income stipulated to by the parties for that period are as follows: Net Income
Year
Per Return
Stipulated
1941
$5,842.71
$15,346.61
1942
4,626.46
15,543.15
1943
7,600.79
11,878.86
1944
6,260.51
22,224.63
1945
4,664.25
18,133.23
The returns for the N.F. partnership for the years 1944, 1945 and 1946 showed net income less than that stipulated at a later date. This is also true for the year 1946 with respect to the N.F.W. partnership. The facts relating to *154 the two partnerships will be discussed hereinafter. Norman's reported and his correct distributive share of net income from the N.F. partnership and the N.F.W. partnership and the differences were as follows: Net
Net
Partner-
Income
Income
Differ-
ship
Year
Reported
Received
ence
N.F.
1944
$3,178.50
$ 4,394.04
$1,215.54
1945
7,868.30
11,406.15
3,537.85
1946
7,743.81
8,766.63
1,032.82
N.F.W.
1946
5,500.53
6,903.22
1,402.69
Norman had no income during 1946 from his own practice. The net income reported and the stipulated income for 1946 were as follows: Net Income
Year
Reported
Stipulated
1946
$9,291.38
$18,478.97
Since the motion for rehearing was granted, the parties have entered into a stipulation of facts which substantially explains the mistakenly claimed deductions, which information has not heretofore been before the Court. After the investigation of Norman's tax liability was commenced by respondent's agents in March 1946, Norman employed two certified public accountants to audit his records and to reconstruct his net income for the years in question. One of the accountants, George *155 Sinderson, reconstructed Norman's income for each of the years 1941 through 1946 by use of the net worth method. The net worth statement prepared by Sinderson disclosed an increase in Norman's net worth, during the period 1941 through 1946, of $48,131, with the yearly increases in net worth ranging from a low of $4,522 to a high of $11,882. Subsequent to the order of the Court of July 8, 1954, it was stipulated by the parties that an audit be made by the petitioners' accountants and respondent's agent to reveal, identify and explain, insofar as possible, the difference between columns captioned "Return" and "Correct", as shown on Exhibit N. The results of that audit were included in a stipulation in the form of separate schedules for each year, with explanations thereto. It was also stipulated that many disbursements were classified differently by petitioners and respondent. The stipulation explains rather minutely, year by year, by classified items, the difference between the reported income and the stipulated income. Issue 2. The Partnerships of Norman and Foulke, 1944 to 1946, inclusive, and Norman, Foulke and Warten, 1946 Norman and Foulke formed a law partnership, as *156 equal partners, on May 1, 1944, which is referred to herein as the N.F. partnership. Prior thereto, each practiced law individually. The partnership agreement applied only to new business. Any fees received by either from cases which were on hand when the partnership was formed were to remain the separate income of each of the partners. A new law partnership, consisting of Norman, Foulke, and Warten, which is referred to herein as the N.F.W. partnership, was formed on January 1, 1946. The new partnership was formed in order to bring Warten into the firm. The partnership agreement, also, applied only to new business, that is, the fees from cases which the N.F. partnership had on hand as of January 1, 1946, were to remain the income of the N.F. partnership. Norman and Foulke, each, had a 40 per cent interest, and Warten a 20 per cent interest in the income of the N.F.W. partnership. The N.F. partnership was not dissolved when the N.F.W. partnership was formed on January 1, 1946. It continued in existence during 1946, and thereafter, for the purpose of completing the cases on hand, and for the further purpose of carrying on the joint real estate transactions of Norman and Foulke.
*157 A. Facts Relating to the N.F. Partnership Norman and Foulke engaged in the general practice of law. A substantial part of their law business consisted of representing plaintiffs in personal injury cases. The records consisted of a clients' ledger and expense sheets, canceled checks, check stubs, deposit slips, duplicate receipt books, and bank statements. There was a sheet for each client, and all items of expense were entered on the expense sheets. These records reflected receipts and disbursements. A general ledger was not kept, but a cash journal was maintained for the year 1946. There was no cash in 1944. The cash received by the partnership in 1945 was computed from the office records, including a duplicate receipt book and cash records from which all cash fees were ascertained. The ledger book contained a sheet for each client. Each fee was listed on the fee sheets; there were duplicate deposit slips for each deposit, and the sources of the funds were listed on the deposit slips. The bank statements, check book stubs, and canceled checks were complete. The entries in the accounting records were made by the stenographer, who was inexperienced in bookkeeping. A commercial *158 bank account was maintained for the partnership at the Joplin National Bank and Trust Co.
There were no cash fees received or reported by the partnership in the year 1944. In 1945 the cash received was recorded in the duplicate receipt book, or a record of it existed in the documents showing the cases handled during that year and the cash for 1945 was computed from these records. In 1946, a cash journal was maintained which was offered and received in evidence at the rehearing. It was checked for accuracy against a similar cash book which was maintained by the Junior partner Warten, who had kept a separate record of his share of cash fees received. In 1945, the partnership purchased real estate which it rented during the year 1946. The partnership return for 1946 shows gross rental income of $3,785. When the investigation of the partners' tax liability was started by the respondent's agents, Norman and Foulke employed Sinderson, a certified public accountant, and Jean Kupchin, a bookkeeper, who worked under Sinderson's direction, to prepare a set of books for the partnership for the years 1944 to 1946, inclusive, and to reconstruct partnership net income for those years.
*159 B. Facts Relating to the N.F.W. Partnership Norman and Foulke formed the new partnership on January 1, 1946, in order to bring Warten into the firm. The N.F.W. partnership merely continued the law business previously carried on by the N.F. partnership. The facts, as set forth above, relating to the conduct of the N.F. partnership are applicable, also, to the N.F.W. partnership. and need not be restated. Warten, who had been discharged from the military service just prior to the formation of the partnership, was a junior partner with a 20 per cent interest. The N.F.W. partnership return for 1946 was prepared by Foulke, after he had had a conversation with the Investigating Agent Dore. It was prepared in the following manner: The return was prepared by Foulke on a "cash" basis by summarizing the deposits and checks and reporting all income and deducting all expenses. There was a difference of opinion between the investigating agent, the petitioners, and the petitioners' accountants as to the proper year in which certain expenses or deductions should be claimed. This difference of opinion substantially caused the difference in reported net income and that asserted by the respondent.
*160 C. Facts Relating to Foulke The reported and the stipulated net income of petitioner Foulke and the difference therein are as follows: Net Income
Net Income
Year
Per Return
Stipulated
Difference
1944
$ 6,391.04
$ 7,607.27
$1,216.23
1945
6,464.20
9,964.40
3,500.20
1946
11,096.71
14,637.51
3,520.80 The stipulated net income for each of the years 1945 and 1946 is the same as the net income which was determined by the respondent in the notice of deficiency. It was stipulated between the parties at the rehearing as follows: "For the year 1944 the difference in the net income per the individual returns of petitioners Emerson and Margaret Foulke and the agreed net income for such years (as set forth in paragraph 1 herein) is due solely to the increase in the Norman and Foulke partnership net income and the resultant increase in petitioners' 50 per cent share thereof. The same is true for 1945 with the exception of the disallowance of luxury tax in the amount of $150 because it is not allowable as a deduction. For the year 1946 the difference in the net income per the individual return of petitioners and the stipulated net income for such year *161 is due to the increase in the net income of the Norman and Foulke partnership and the Norman, Foulke and Warten partnership and to the following adjustments by the Commissioner to petitioners' individual 1946 return: "(a) Deduction for excise taxes disallowed since such taxes are not deductible. Of the $240.28 deduction claimed, $75 has been allowed for deductible taxes. "(b) Deduction claimed in the amount of $600 for loss from theft of fence and posts. The theft actually occurred in 1946, but the person alleged by petitioners as the thief claimed in litigation to own the fence and posts which litigation was pending on appeal in 1946 and was not finally decided until after the period involved. The litigation was finally decided favorable to petitioners and the loss taken on petitioners' 1950 returns and allowed on audit in the amount of $650. "(c) Deduction of $350 claimed on return as share of the expenses of appeal in the Hebbard case disallowed because no loss was sustained during 1946. This expense was actually incurred but disallowed because it was a claimed deduction for a loss in a case which was not finally decided until after the period involved herein. A claim for *162 refund is now pending." Ultimate Facts The net income of the N.F. partnership for each of the years 1944 to 1946, inclusive, and of the N.F.W. partnership for the year 1946 was not understated with fraudulent intent to evade taxes in the respective partnership income tax returns. No part of the deficiency for any of the years 1944, 1945, and 1946, in Docket No. 24249, Emerson and Margaret Foulke, is due to fraud with intent to evade tax. No part of the deficiency for any of the years 1941, 1942, 1943, 1944, 1945, and 1946 in Docket Nos. 24251 and 24250, Kelsey Norman, Kelsey Norman and Ruth Norman, is due to fraud with intent to evade tax. Kelsey Norman did not file a false and fraudulent return for the year 1941. Determination of a deficiency in income tax of Kelsey Norman for 1941 is barred by the statute of limitations. Part of the deficiency for each of the years 1944, 1945, and 1946, in Docket No. 24249, and part of the deficiency for each of the years 1942-1946, inclusive, in Docket Nos. 24251 and 24250, is due to negligence or intentional disregard of rules and regulations but without intent to defraud. Opinion In these proceedings, the parties, from the outset, *163 endeavored to agree upon the amounts of the taxable net income in each of the taxable years of Kelsey Norman, Emerson Foulke, and of the law partnerships of which they were members. Kelsey Norman at all times admitted that the accounting records of his receipts from his business and from his real estate, and of his expenditures were incomplete and inadequate. With respect to the accounting records of the partnerships, the petitioners have admitted that the records were kept in an informal way and that they were incomplete and inadequate. In this situation, it was with great difficulty that the parties initially reached an agreement during the original trial of these proceedings about the amounts of net taxable income in each year, of each petitioner and of each partnership. It appears that in order to arrive at stipulated amounts of taxable net income, the representatives of the taxpayers, both their attorneys and accountants elected to agree upon adjustments because of the inadequacies of accounting records. After the parties reached agreements about the amounts of taxable net income, during the original trial, the Court requested the preparation of an exhibit which would explain *164 in detail the differences between income reported in returns and income sitpulated by the parties during the trial. The Court, in its original considerations of the issue to be decided, gave a great deal of weight to the explanatory exhibit, and understood the details therein set forth as correctly reflecting facts. After the filing of the original Findings of Fact and Opinion in these proceedings, counsel for the petitioners filed a lengthy, analytical brief in which objections were made to the Court's findings and conclusions based on the disputed exhibit, exhibit N, and explanations were given about the manner in which stipulations as to income were reached. Since the exhibit incorporated the stipulations, the petitioner's counsel argued, the Court was unable to evaluate the exhibit properly without having knowledge about arbitrary agreements arrived at in compromise out of Court, such matters not having been made part of the record. It will serve no useful purpose to elaborate upon the difficulties of the representatives of the parties in checking, auditing, re-auditing, and reconciling, and explaining items entering into the taxable income of the respective petitioners and *165 of their partnerships. In some instances, it has been found that the taxpayers are entitled to larger deductions for expenses. In other instances the taxpayers agree that items of income were not correctly stated in their books. Adjustments have been made upon the basis of facts which were unknown to or not ascertained by the agents when they made their original audits and investigation. We granted petitioner's motions for further hearing because we were satisfied upon consideration of the matters set forth in the motions of the petitioners that there was misunderstanding about certain exhibits, about facts to be found from the exhibits, and about the weight to which they were entitled. However, at this time it should be said that certain exhibits which were introduced into evidence at the original hearing in these proceedings were not clear in themselves, and testimony was not offered to clarify such exhibits. We believe that the apparent difficulties which the Court seems to have had in evaluating and analyzing certain exhibits was essentially the same as the representatives of the parties have had in their mutual efforts to make order out of the coufusion which has been engendered *166 by the extremely poor accounting records which were kept by or for Kelsey Norman and the partnerships in which he and Emerson Foulke were members. Upon the further hearing, new evidence has been received, new stipulations have been filed, additional exhibits have been received, and a great deal of clarifying explanations have been made part of the new stipulations. Prior to the further hearing, representatives of the Commissioner and of the petitioners made audits of the accounting records of the parties. Reconciliation of items in the income tax returns and in exhibit N have been made. Such matters as errors in additions of figures in income tax returns have been pointed out. The Court and the parties have hereby been saved the otherwise considerable use of time which would have been required if all of these matters hav been developed and proved in the course of the further hearing. At the original hearing, there was some testimony about the various illnesses of Kelsey Norman over several years before and including the taxable years. At the further hearing, considerably more evidence on this subject was introduced. This evidence is new evidence. It relates not only to the petitioner, *167 Kelsey Norman, but also to his relations by blood. It was offered to show that serious conditions of illness have existed in the family of Kelsey Norman, of different kinds, types, and degrees, that there devolved upon Kelsey Norman the responsibility of looking after both the individuals involved, their problems, and their difficulties. It was offered to establish that Kelsey Norman, as a result, suffered severe strain, pressure, and anxiety. Other new evidence was received which related entirely to the lack of good health of Kelsey Norman and to the effects upon him of strain and anxiety. The Court does not fail to give consideration to all of such evidence. It has been given consideration. It serves, to a considerable extent, to explain Norman's disregard of and lack of careful attention to, the accounting records which were kept in an inadequate and incomplete way for him. It serves to explain his irregularities, his neglect of office routines, his lack of supervision of the way the accounting records for all of his business and professional activities were kept. With the foregoing, partial explanation of the problems which have beset all interested parties to these proceedings, *168 as well as the Court, we turn to the questions to be decided. In each of these proceedings, the Commissioner determined that income or profit was understated in each taxable year by each petitioner in income tax returns, and that unsubstantiated deductions were taken. In each petition, the taxpayer alleged error in the Commissioner's determinations that income or profit was understated and that deductions taken in the returns were not allowable deductions. During the original trial, however, the petitioners, after the commencement of the trial, entered into stipulations with the respondent in which they agreed that deficiencies in taxes, in lesser amounts than respondent originally determined, existed. That is to say, they stipulated, in effect, that errors had been made in the returns from which understatements of income resulted. The stipulations represented the results of conferences with respondent's representatives, and did not specify any details of the basis for the stipulations. The stipulations as to the amounts of each petitioner's taxable net income for the taxable years and as to the net earnings of partnerships appeared to save the parties, the Court, and the record *169 extensive explanations of the accounting methods used in keeping records of the law practice of the petitioners, and of the way the books were kept. As later became evident, the stipulations also stood in the way of bringing out explanations of differences between petitioners and the agents of the respondent as to the method of accounting which would best serve to clearly and accurately reflect the income of each taxable year. The point to be stressed is that neither of the petitioners, by entering into the stipulations intended, according to the Court's present understanding, to admit deliberate omissions of and failures to report income in returns. This is of importance in considering the question of whether any part of the deficiencies was due to fraud with intent to evade tax under section 293(b) of the 1939 Code. Nevertheless, sharp conflicts and disputes have existed between some agents of the respondent and the petitioners about the matter of whether the failure to keep clear and adequate accounting records was in itself evidence of fraudulent intent. Such controversies and conflicts were evident during the original trial of these proceedings. Since then, a considerable amount *170 of this type of controversy between the parties has been reduced through the post-trial audits, reconciliations of differences between amounts shown in the books and in the returns, and explanations, all of which are made part of and reflected in the new and additional stipulations which were filed at the further hearing. Nevertheless the respondent is not fully satisfied with the further audits and analyses, and there remains the question of whether all or any part of any deficiency for any taxable year is due to fraud with intent to evade tax. It was the respondent's burden to prove, by clear and convincing evidence, that all or part of any deficiency was due to fraud with intent to evade tax. Whether or not the respondent has sustained the burden of proving fraud is to be determined from the entire record. William W. Kellett, 5 T.C. 608, 616; Wallace H. Petit, 10 T.C. 1253, 1257; L. Schepp Co., 25 B.T.A. 419, 440. The respondent has relied chiefly upon the concessions of the petitioners that their taxable net income, respectively, is greater than net taxable income reported in returns, which concessions were made under stipulations. Upon *171 that basis, the respondent argues that repeated understatements of income in substantial amounts are strong evidence of fraudulent intent to evade taxes. He relies primarily upon Rogers v. Commissioner, 111 Fed. (2d) 987, affirming 38 B.T.A. 16. The Court has heard and received further evidence offered by the petitioners. Some of it indicates that Norman used a method of accounting in his law practice about the accuracy of which method there is frequently a difference of opinion on the point of whether it properly reflects annual income. Norman's law practice involved injury and damages litigation. He customarily paid costs of clients, medical expenses, and fees which were to be repaid by clients. It appears that the respondent's determinations that income was understated in each year results, in part, from his application of a different method of analyzing clients' accounts. Since the accounting records were not kept well, difficulties have been multiplied. The Court now concludes and has found, upon further hearing, and further consideration of the entire record that the respondent has not met his burden of proof, and that there is no clear and convincing *172 evidence that each petitioner fraudulently intended to evade taxes. The evidence is not quite adequate to support the burden. In reaching the above conclusion, the Court has carefully reviewed the entire record, and is of the opinion that there has been at all times a basis for strong suspicion on the part of the respondent's agents that Norman's inadequate accounting records of his individual business activities, and of the law partnerships, evidenced a pattern of fraudulent intent to evade taxes. Nevertheless, "suspicion of incredible ignorance or of actual knowledge on his part is not enough. Negligence, careless indifference, or disregard of rules and regulations would not suffice." Walter M. Ferguson, Jr., 14 T.C. 846, 849. See, also, L. Glen Switzer, 20 T.C. 759, 765, and cases cited therein. The record now establishes that Norman suffered very poor health and was subject to severe strain and anxiety during the taxable years. This evidence provides some explanation for the lack of proper records. There is no doubt that Norman was extremely negligent and careless about his and his partnership's accounting records. In spite of his health and family *173 problems, he could and should have hired competent bookkeeping and accounting services. Also, Foulke was negligent, and as he did not suffer poor health or work under severe strain he was better able to exercise care. Under all of the circumstances, however, we are now satisfied that the negligence of both of the petitioners in each of the taxable years was not equivalent to intent to defraud. In the case of Emerson Foulke, the understatements of his taxable income result from understatements of the income of the law partnerships in the taxable years. It is now clear that much of the understatement resulted from taking unallowable deductions. The stipulations and explanations which are now before us satisfy us that none of the understatements of Foulke's income for any taxable year was due to fraudulent intent to evade taxes. It is held, therefore, that the 50 per cent additions to the deficiencies in each of the taxable years 1942 through 1946 have been improperly imposed against each petitioner. Respondent's determinations of fraud in all of the proceedings is reversed. It is held, also, that Norman did not file a false or fraudulent return for 1941. It follows that the deficiency *174 in income tax for 1941 is barred by the statute of limitations, and the fraud penalty for 1941 falls since there is no deficiency for 1941. Since, upon the receipt of additional evidence, it is necessary to amend and revise some of the facts found and conclusions reached in the original Memorandum Findings of Fact and Opinion which was filed on March 31, 1954 [13 TCM 329,], and since it would be cumbersome, by appropriate Order, to make the required amendments and revisions, we have by separate Order vacated and set aside the original Findings of Fact and Opinion in so far as it relates to these petitioners. In the alternative, the respondent, at the further hearing, by amendments to his answers asserted that each deficiency for each taxable year is due to negligence under section 293(a) of the 1939 Code, and he made claim for 5 per cent additions to the deficiencies. The petitioners, by appropriate pleadings, admitted negligence. Therefore, there is no question before us under section 293(a). But if the question were before us, respondent would be sustained. He has clearly established that the deficiencies are due to negligence or disregard of rules and regulations, *175 and we have so found. Decisions will be entered under Rule 50. Order For cause, it is ORDERED: That the Memorandum Findings of Fact and Opinion filed on March 31, 1954 in the above-entitled proceedings [13 TCM 329, Dec. 20,254(M)] is hereby vacated and set aside in so far as it involves and relates to the tax liability of the following petitioners; Emerson Foulke and Margaret Foulke (Docket No. 24249), Kelsey Norman and Ruth N. Norman (Docket No. 24250), and Kelsey Norman (Docket No. 24251), in whose cases no decision has been entered, and a separate Memorandum Findings of Fact and Opinion is being entered on the same day as the date of this Order in lieu of the report filed on March 31, 1954, further hearing having been held in Docket Nos. 24249, 24250, and 24251. In Docket No. 24248, Henry Warten, petitioner, decision has been entered in accordance with the Memorandum Findings of Fact and Opinion filed on March 31, 1954. The Memorandum Findings of Fact and Opinion filed on March 31, 1954, in so far as it sets forth findings of fact and conclusions of facts and of law under the issues in Docket No. 24248, Henry Warten, petitioner, remains in effect and *176 is not modified. (Signed) MARION J. HARRON, Judge. Dated: Washington, D.C. June 30, 1955. Footnotes
1. The following proceedings are consolidated: Docket No. 24249, Emerson Foulke and Margaret Foulke; Docket No. 24250, Kelsey Norman and Ruth N. Norman; Docket No. 24251, Kelsey Norman.↩
2. The proceeding of Henry Warten, Docket No. 24248, originally was consolidated with Docket Nos. 24249, 24250, and 24251. Decision has been entered in Docket No. 24248, and it is no longer consolidated with the cases of Emerson Foulke and Kelsey Norman, Docket Nos. 24249, and 24250, and 24251.↩